## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HIGH INCOME SECURITIES FUND,<br><br>     Plaintiff,<br><br>  v.<br><br>CEDAR REALTY TRUST, INC., CEDAR REALTY TRUST PARTNERSHIP, L.P., BRUCE J. SCHANZER, GREGG A. GONSALVES, ABRAHAM EISENSTAT, STEVEN G. ROGERS, SABRINA KANNER, DARCY D. MORRIS, RICHARD H. ROSS, and SHARON STERN,<br><br>     Defendants. | Civil Action No. 2:22-cv-4031<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff High Income Securities Fund ("Plaintiff") alleges the following upon personal knowledge as to itself and its own actions, and upon information and belief as to all other matters, based upon an investigation conducted by Plaintiff and its counsel, which included, among other things, review of materials obtained through public filings with the United States Securities and Exchange Commission ("SEC") and other publicly available sources, including press releases.

## I.  INTRODUCTION

1. Plaintiff purchased and is a holder of 6.50% Series C Cumulative Redeemable Preferred Stock ("Preferred Stock") issued by Defendant Cedar Realty Trust, Inc. ("Cedar" or the "Company"), a real estate investment trust ("REIT") that invests primarily in grocery store properties.

2. Throughout 2021, Cedar issued a series of press releases stating that its Board of Directors (the "Board") was conducting a formal process to identify a strategic transaction that would maximize value for *all* of Cedar's stockholders—*i.e.* both its common stockholders and preferred stockholders.

3.     In January and February 2022, Plaintiff purchased Preferred Stock based on the understanding that the Board was seeking a strategic transaction that would maximize value for all Cedar stockholders. Plaintiff would not have purchased Preferred Stock otherwise.

4.     Behind the scenes, however, the Board and management were orchestrating a very different kind of transaction involving multiple unaffiliated purchasers of the Company's real estate and a merger with Wheeler Real Estate Investment Trust, Inc. ("Wheeler"), a tiny REIT with a shoddy performance record and a history of abusing its own preferred stockholders. The transaction was designed to extract virtually all of the Company's value for the benefit of only *common* stockholders at the expense of *preferred* stockholders, including Plaintiff, whose investments would be drastically impaired.

5.     Instead of accurately disclosing that the Board was arranging a transaction that would obliterate the value of the Preferred Stock, it kept the pending transaction secret and repeatedly informed investors that it was acting in the best interests of all stockholders and was working on a transaction to maximize value for all stockholders.

6.     These misleading public statements were designed to temporarily avoid negative publicity and an uprising of preferred shareholders until the terms of the transaction could be finalized with all parties. Indeed, the uprising by preferred shareholders would commence as soon as the Board announced the deal in the form of a massive selloff of the Preferred Stock and the filing of multiple class action lawsuits.

7.     On March 2, 2022, the Company announced the Transaction (defined below), which will divest the majority of Cedar's properties to multiple parties and, thereafter, Cedar will effectively be dissolved by merging its limited remaining holdings into a subsidiary of Wheeler.

8.      Common stockholders will receive cash in exchange for their shares at an enormous premium to the market price, but preferred stockholders will not share in the deal consideration and the Preferred Stock will become the obligation of the surviving entity, a much weaker company, controlled by Wheeler, a manager with a track record of abusing its own preferred shareholders.

9.      Contrary to its prior public statements, in announcing the Transaction, the Board admitted that it had designed the deal only to maximize value for *common* stockholders, not all stockholders.

10.     Upon announcement of the Transaction, the price of the Preferred Stock plummeted by 57% on heavy trading volume, reflecting the extent to which the market and investors had been misled with respect to the true intent of the Board's evaluation of strategic alternatives.

11.     As of today, Plaintiff has incurred unrealized losses of approximately $1.5 million as a result of Defendants' misconduct.

12.     This action asserts claims under the federal securities laws and the common law arising from Defendants' misrepresentations.

## II.      THE PARTIES

### A.      Plaintiff

13.     Plaintiff is a registered closed-end investment company organized as a Massachusetts business trust. It invests in a range of securities, including publicly issued preferred stock.

14.     Between January 7, 2022 and February 28, 2022, Plaintiff purchased 85,770 shares of Cedar's 6.50% Series C Cumulative Redeemable Preferred Stock, as set forth in further detail below.

B.    **Defendant Cedar**

15.    Cedar is a REIT and a Maryland corporation with a principal executive office at 928 Carmans Road, Massapequa, New York 11758. Its objective is to provide a managed real estate portfolio consisting primarily of grocery-anchored shopping centers from Washington, D.C. to Boston.

16.    Cedar conducts substantially all of its business through Defendant Cedar Realty Trust Partnership L.P. (the "Operating Partnership"), of which Cedar owns a 99.4% interest and is the sole general partner.

C.    **Individual Cedar Defendants**

17.    Defendant Bruce Schanzer has been the President, Chief Executive Officer, and a director of Cedar since 2011. Upon information and belief, he is a resident of New York.

18.    Defendant Gregg Gonsalves has been a Cedar director since 2017 and became Chairman in 2021. Upon information and belief, he is a resident of New Jersey.

19.    Defendant Abraham Eisenstat has been a Cedar director since 2015. Upon information and belief, he is a resident of Florida.

20.    Defendant Steven Rogers has been a Cedar director since 2016. Upon information and belief, he is a resident of Maryland.

21.    Defendant Sabrina Kanner has been a Cedar director since 2018. Upon information and belief, she is a resident of Canada.

22.    Defendant Darcy Morris has been a Cedar director since 2021. Upon information and belief, she is a resident of Canada.

23.    Defendant Richard Ross has been a Cedar director since 2021. Upon information and belief, he is a resident of Florida.

24.     Defendant Sharon Stern has been a Cedar director since 2021. Upon information and belief, she is a resident of New York.

**D.    <u>Non-Party Wheeler</u>**

25.     Wheeler is a REIT organized as a Maryland corporation with principal executive offices at 2529 Virginia Beach Blvd., Suite 200, Virginia Beach, VA 23452.

### III.    <u>JURISDICTION</u>

26.     Counts I and II asserted herein arise under and pursuant to § 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Count III arises under the common law.

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1332 and 1367.

28.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because the misconduct at issue occurred within this judicial district and Cedar is a resident of this judicial district.

29.     This Court has jurisdiction over Cedar because its principal place of business is Massapequa, Nassau County, New York.

30.     This Court has jurisdiction over the Individual Cedar Defendants pursuant to CPLR § 301 because they are domiciled in New York and/or continuously and systematically do business in New York through Cedar, of which they are senior executive officers and directors.

31.     This Court also has jurisdiction over the Individual Cedar Defendants pursuant to CPLR § 302(a) because they transact business within the state through Cedar, which maintains its principal offices in Massapequa, New York, and the misconduct at issue in this action occurred substantially in New York.

## IV.     SUBSTANTIVE ALLEGATIONS

**A.     Cedar's Board Announces That It Will Seek A**
**Transaction That Maximizes Value For All Stockholders**

32.     In or around 2018, Cedar's common stock price began to trade at significant discount in comparison to its net asset value per share ("NAV") as well as to its peers. NAV consists of the value of the Company's assets minus its liabilities.

33.     For example, during 2018, while the shopping center public REIT sector traded on average at a 12% discount to NAV, the Company's common stock price traded as low as a 55% discount to NAV.

34.     In July 2019, the Board formed a special committee to consider strategies to maximize stockholder value, including maintaining the Company's current strategy, selling non-core assets, pursuing larger asset sales in portfolio or Company-level transactions, or implementing a phased liquidation of the Company.

35.     The special committee was authorized to consider and evaluate any proposals that might be received by the Company regarding a potential sale transaction, in whole or in part, and to participate in and direct the negotiation of the material terms and conditions of any such transaction.

36.     This process was interrupted by the Covid-19 pandemic but began again in earnest in early 2021 as the Board responded to continued demands from stockholders to take action to improve the Company's position.

37.     Specifically, in February 2021, three large investors—Barington Companies Equity Partners, L.P. ("Barington"), Ewing Morris & Co. Investment Partners Ltd. ("Ewing Morris"), and Camac Partners, LLC ("Camac")—each independently announced that they were nominating their own directors for election to the Board, including Defendants Darcy Morris on behalf of Ewing

Morris and Richard Ross and Sharon Stern on behalf of Camac, in an effort to sway the Company's management.

38.     On March 1, 2021, Camac stated in a press release that its nominees, including Defendants Richard Ross and Sharon Stern, were "committed to acting in the best interest of *all* of Cedar Realty's shareholders as independent directors."[1]

39.     In a series of responsive press releases in 2021 by the Company, Cedar stated and reaffirmed that the Company and the Board itself was working to maximize value for *all stockholders—i.e.* holders of both preferred and common stock—through a strategic transaction or otherwise.

40.     For example, on March 2, 2021, in response to the February 2021 announcements by Barrington, Ewing Morris, and Camac, the Company stated in a press release entitled "Cedar Realty Trust Comments On Recent Public Announcements":

> Cedar Realty Trust's Board of Directors and management team are committed to acting in the best interests of *shareholders* as we work to deliver best-in-class performance for our *investors and other stakeholders*. . . . We remain committed to corporate governance best practices and intend to further strengthen our Board with the near-term addition of one or more highly qualified candidates. . . . [O]ur Board and management team are focused on navigating through this pandemic period and maximizing value for our *shareholders*. We are always open to constructive input and assess all good ideas to create value for *shareholders* as the market and the Company's share price continue to recover from this unprecedented time.

41.     On April 28, 2021, Cedar announced that it had made a deal with Barrington, Ewing Morris, and Camac for the appointment of three new directors: Defendants Darcy Morris, Richard Ross and Sharon Stern. In connection with the appointment of these new directors, the Company

---

[1] All emphasis added unless otherwise noted.

again reaffirmed through a press release that it and its new directors would be working to maximize value for *all* shareholders:

> Cedar's Board of Directors is committed to adhering to the highest standards of corporate governance and acting in our *shareholders'* best interests. To that end, after thoughtful deliberation, and in consultation with our shareholders, we are pleased to welcome Darcy [Morris], Richard [Ross], and Sharon [Stern] to our Board and look forward to working collaboratively with them to reach our goal of delivering superior *shareholder* value in the years ahead. Our new directors bring substantial real estate and capital markets industry expertise and fresh perspectives, and further enhance our Board's alignment with *shareholders*.

42.     On September 9, 2021, Cedar announced that it had "initiated a dual-track process" led by the Board and its new additions as a continuation of the process launched by the special committee in 2019. Again, the Company confirmed that the purpose was to identify strategic transactions with the purpose of maximizing value for *all* shareholders of the Company:

> [The] Board of Directors has initiated a dual-track process to review the Company's strategic alternatives in order to maximize *shareholder* value. As part of this process, Cedar is exploring, among other alternatives, a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored shopping center portfolio and its mixed-use redevelopment projects. . . . The Board is committed to maximizing value for *all our shareholders* and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that.

43.     The statements set forth in the paragraphs above are referred to collectively as the "Misstatements."

**B.      The Board Negotiates A Value-Destroying
            Transaction For Preferred Stockholders**

44.     Despite repeatedly representing to the investing public that the Company was seeking a value-maximizing transaction for *all* stockholders, Defendants knew by at least August 2021 that any deal was likely to result in benefits only for common stockholders, who would exit at a premium, while preferred stockholders would not receive deal consideration and would be relegated to a smaller and less secure version of the Company surviving the transaction.

45.     On August 3, 2021, the Board was actively negotiating the sale of a significant portion of Cedar's assets to multiple counterparties and instructed management to "make outreach to potential counterparties" for the Company's remaining assets with the expectation that the deal(s) for the Company's primary assets would be successful.

46.     The remaining assets of the surviving company was referred to as "Remainco".

47.     Despite having received multiple offers for the Company as a whole, the Board continued to orchestrate a transaction that would chop up the Company's properties, allow common stockholders to exit at a premium, and leave preferred stockholders behind as stockholders of Remainco—a significantly weakened version of Cedar.

48.     On January 19, 2022, after discussions with various potential counterparties, the Company began discussions with Wheeler regarding a transaction for Remainco.

49.     On January 27, 2022, the Company received a non-binding term sheet from Wheeler, which contemplated the acquisition of Remainco in an all-cash transaction payable only to common stockholders, who would exit at a premium.

50.     As to preferred stockholders, Wheeler's proposal contemplated that the Preferred Stock would remain outstanding following the completion of the transaction as preferred stock of Remainco, and that the Preferred Stock would not be exchanged for preferred stock in Wheeler in the merger transaction—*i.e.*, preferred stockholders would get nothing in the transaction and would be relegated to a riskier and smaller entity controlled by Wheeler.

51.     On February 11, 2022, lawyers for the Company transmitted a draft merger agreement for the transaction between Remainco and Wheeler.

52.     On February 28, 2022 the Board instructed management to finalize "all transaction documents" with Wheeler.

53.     None of the above was known to investors, including Plaintiff, until the announcement of the Transaction as described below.

### C.    **Plaintiff Purchases Shares**

54.     In reliance upon on publicly available information, including the Misstatements regarding the purpose and intent of the Board's consideration of strategic alternatives—*i.e.*, that it was seeking a deal that would maximize value for *all* stockholders—Plaintiff began to purchase shares of Preferred Stock in early 2022.

55.     Between January 7, 2022 and February 28, 2022—after the Board had represented that any transaction would seek to maximize value for all stockholders but before the true nature of the pending transaction was disclosed—Plaintiff purchased 85,770 shares of Preferred Stock.

56.     Had the Company disclosed its true intent to maximize only the value of its common stock in the transaction being considered, Plaintiff would not have purchased the Preferred Stock.

### D.    **The Abusive Transaction Is Announced**

57.     On March 2, 2022, the Board revealed the true nature of the deal that it had orchestrated, which it would admit was designed to benefit only common stockholders at the expense of preferred stockholders.

58.     Under the proposed transaction, the Company will sell itself and all of its assets in a series of related all-cash transactions with third parties: (i) an agreement to sell a portfolio of 33 grocery-anchored shopping centers for $840.0 million to joint venture between a fund managed by DRA Advisors LLC and KPR Centers; (ii) an agreement to sell the Company's Revelry redevelopment project for $34.0 million; (iii) an agreement to sell the Company's Northeast Heights redevelopment project for $46.5 million; and (iv) an agreement pursuant to which Cedar

(*i.e.*, Remainco) would then merge with WHLR Merger Sub Inc., a "shell" subsidiary entity of Wheeler, with Cedar as the surviving entity controlled by Wheeler (together, the "Transaction").

59.     The press release announcing the Transaction revealed that the Board's process had actually been focused on, and driven by, only the interests of the Company's "common shareholders." The Company stated:

> We believe this combination of transactions represents the best possible outcome for our *common shareholders* and we are very pleased with the progress thus far of our dual-track review of strategic alternatives.

60.     The Transaction will generate net proceeds, after expenses, of more than $29.00 per share in cash for *common* stockholders, which will be distributed to common stockholders upon completion. This represents a 16.6% premium to Cedar's closing share price on March 2, 2022 and a *70.6% premium* to the Company's closing share price on September 9, 2021—the date on which the Board falsely advised the market that it was seeking a transaction for the benefit of "*all our shareholders.*"

61.     Holders of Preferred Stock, on the other hand, will be stripped of substantial assets, excluded from any deal consideration, deprived of the value of their liquidation rights (which the Board intentionally avoided in structuring the Transaction), and left with a weaker version of Cedar under Wheeler's control. No element of the Transaction could be seen as maximizing or even protecting the rights of preferred stockholders.

62.     Moreover, in selecting Wheeler as a transaction partner—a tiny firm with historically inferior performance and a history of abusing its preferred stockholders—the Board has relegated the fate of the Preferred Stock to a manager widely known for scandalizing and abusing preferred stockholders, which the market instantly recognized in the sell-off discussed below.

63.     For example, as recently as March 2018, Wheeler's Board of Directors suspended all contractual dividend payments on its own Series A, Series B, and Series D preferred stock and, by the end of 2020, reported dividend arrears of over $30.5 million.

64.     Having refused to pay dividends to Series D holders for years, Wheeler then began to buy back Series D preferred stock through a tender offer announced on December 23, 2020 at prices below the market and far below liquidation value. It ultimately acquired over 500,000 shares.

65.     Then, as to Series A and B preferred stock, in August 2021, Wheeler announced a special meeting of its common stockholders to eliminate all historical accumulated and unpaid dividends—approximately $12 million at the time—and remove all cumulative dividend rights going forward. Wheeler justified the move by citing efforts to "optimize the capital structure of the Company."

66.     As to the Series D shares remaining after Wheeler's tender offer, Wheeler continues to aggregate dividend arrears, which now exceed $26 million. It has no apparent plans of remediating the arrears or even the ability to do so, given that the arrears exceed Wheeler's current market capitalization.

67.     As a result of the misconduct above, among other things, Wheeler is currently litigating two actions against it: the first for failing to pay dividends to preferred stockholders; the second for improperly avoiding a liquidation of Series D preferred stock, despite having triggered one by violating the net asset ratio required by the governing document, by improperly modifying the governing document without consent of the preferred holders.

68.     Upon announcement of the Transaction, the price of the Preferred Stock plummeted from $22.85 on March 2, 2022 to $9.85 at the close of trading on March 3, 2022 with nearly 250

times the trading volume of the previous day, resulting in a decline in total market capitalization of *over $65 million*.

69.     The size and scale of this decline demonstrates the extent to which the market had been misled by the Board's Misstatements that it was seeking to maximize value for *all stockholders*, not only common stockholders.

70.     As a result, Plaintiff has incurred unrealized losses of approximately $1.5 million.

## CAUSES OF ACTION

## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b5-1
Against All Defendants**

71.     Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

72.     This count is asserted against Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

73.     During the relevant period, Defendants, individually and in concert, directly and indirectly, disseminated, caused to be disseminated, and approved the Misstatements specified above, which they knew or should have known were false and misleading.

74.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud Preferred Stock investors, including Plaintiff; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff in connection with the purchase of Preferred Stock.

75.     Defendants did so in an effort to avoid negative publicity and litigation that would have adversely affected ongoing negotiations with the various counterparties, resulting in an artificially inflated price of the Preferred Stock while Cedar secretly finalized the Transaction. Defendants acted with scienter in that they knew that the Misstatements were false and misleading but chose to make the Misstatements, and leave them uncorrected, for purposes of avoiding litigation and dissent until after the Transaction was finalized.

76.     Because of the Misstatements, the market price of the Preferred Stock was artificially inflated at the time Plaintiff purchased its shares.

77.     Plaintiff relied on the Misstatements described above and the integrity of the market price of the Preferred Stock in purchasing Cedar's Preferred Stock. Had Plaintiff been aware of the falsity of the Misstatements and that Defendants had artificially inflated the market price of the Preferred Stock, it would not have purchased the Preferred Stock.

78.     By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff for damages in an amount to be established at trial.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Cedar Defendants

79.     Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

80.     This count is asserted against Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t.

81.     The Individual Cedar Defendants managed and controlled the business affairs of the Company and were control persons of the Company, including by dictating the operations and

management of Cedar, and therefore were "controlling persons" of Cedar within the meaning of Section 20(a).

82.     Specifically, the Individual Cedar Defendants themselves drafted and approved all public statements made by the Company whether through press releases and otherwise, including the Misstatements. As set forth above, the Individual Cedar Defendants determined, on the Company's behalf, to make the Misstatements in lieu of disclosing the true nature of the pending transaction based on an intentional and strategic decision to avoid negative publicity and litigation until the deal could be finalized between the parties. The Company has no other way of making such strategic decisions or disseminating statements to the investing public other than through its officers and directors, the Individual Cedar Defendants, which are responsible for managing the Company's affairs under its governing documents and Maryland law.

83.     As officers and/or directors of Cedar, the Individual Cedar Defendants had a duty to disseminate only accurate and truthful information with respect to the Company's operations and to correct any public statement(s) made by the Company which had become materially false or misleading.

84.     Because of their positions of control and authority, the Individual Cedar Defendants were able to, and did, control the contents of the press releases made by the Company, which were disseminated in the marketplace.

85.     Because of their senior managerial positions within the Company, the Individual Cedar Defendants knew of the nature of the Transaction being negotiated on behalf of the Company and knew of the falsity of the Company's public statements describing the Transaction. Nonetheless, the Individual Cedar Defendants caused the Company to issue and/or fail to correct

the Misstatements, which caused artificial inflation in the price of the Preferred Stock until the Transaction was announced in March 2022.

86.     By reason of the foregoing, the Individual Cedar Defendants are liable to Plaintiff pursuant to Section 20(a) of the Exchange Act in an amount to be determined at trial.

## COUNT III

**Common Law Negligent Misrepresentation
Against All Defendants**

87.     Plaintiff repeats and realleges all of the allegations set forth in the paragraphs above as if fully set forth herein.

88.     Defendants owed a duty to stockholders and the investing public, including Plaintiff, with respect to the accuracy of public statements to investors regarding the Company.

89.     Defendants knew or should have known that their public statements to investors, including the Plaintiff, would be relied and/or acted upon by investors and could cause damages if they were false and misleading.

90.     The Misstatements were false and misleading because the Board, in connection with identifying strategic alternatives for the Company, was not considering a transaction that would maximize value for all stockholders but rather, from the outset, was pursuing a transaction designed only to maximize the interests of common stockholders at the expense of preferred stockholders.

91.     Defendants knew or should have known that the Misstatements were false and misleading but breached their duty to Plaintiff by making the Misstatements, causing them to be made, and/or failing to timely correct them.

92.     Plaintiff purchased Preferred Stock in reliance on the Misstatements.

93.     Plaintiff has incurred significant damages as a result of the Misstatements in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.      Awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' Misstatements in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiff the costs of this action, including reasonable attorneys' fees, accountants' fees, consultants' fees, and experts' fees, costs, and expenses; and

C.      Granting such further relief as the Court deems just and proper.


Dated: July 11, 2022

                                        **MORRIS KANDINOV LLP**

                                         */s/* Andrew W. Robertson
                                        Aaron T. Morris
                                        Andrew W. Robertson
                                        1740 Broadway, 15th Floor
                                        New York, NY 10019
                                        (877) 216-1552
                                        aaron@moka.law
                                        andrew@moka.law

                                        *Attorneys for High Income Securities Fund*