UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

HIGH INCOME SECURITIES FUND,

FILED
CLERK

10:01 am, Sep 25, 2023

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

                                        Plaintiff,

        -against-

CEDAR REALTY TRUST, INC., CEDAR REALTY
TRUST PARTNERSHIP, L.P., BRUCE J. SCHANZER,
GREGG A. GONSALVES, ABRAHAM EISENSTAT,
STEVEN G. ROGERS, SABRINA KANNER,
DARCY D. MORRIS, RICHARD H. ROSS,
and SHARON STERN,

                                        Defendants.

--------------------------------------------------------------------X

**MEMORANDUM & ORDER**
22-CV-04031 (JMA) (JMW)

**AZRACK, United States District Judge:**

Plaintiff High Income Securities Fund claims that Defendants Cedar Realty Trust, Inc. ("Cedar" or the "Company"), Cedar Realty Partnership, L.P. ("Cedar LP"), and eight individual Cedar officers (the "Individual Defendants") made materially false or misleading statements or omissions in violation of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), as well as SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff also brings derivative claims against the Individual Defendants for control person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Finally, Plaintiff asserts negligent misrepresentation claims against all Defendants based on the same facts.

Currently before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), as well as 15 U.S.C. § 78u-4(b)(3)(A). (ECF No. 21.) For the following reasons, Defendants' motion is granted, and the complaint is dismissed.

## I.        BACKGROUND

### A.    Facts

#### 1.        The Parties

Cedar is a real estate investment trust, or "REIT," that "provide[s] a managed real estate

portfolio consisting primarily of grocery-anchored shopping centers from Washington, D.C. to Boston." (Compl. ¶ 15, ECF No. 1.)  Cedar owns a 99.4% interest in and is the sole general partner of Cedar LP, through which it conducts substantially all its business.  (Id. ¶ 16.)  The Individual Defendants are all members of Cedar's board of directors (the "Board"), with Gonsalves serving as Chairman.  (Id. ¶¶ 17–24.)  In addition to his role as a director, Schanzer is Cedar's President and CEO.  (Id. ¶ 17.)

Plaintiff is a registered closed-end investment company that "invests in a range of securities, including publicly issued preferred stock."  (Id. ¶ 13.)

### 2.    Cedar's Underperformance and Shareholders' Response (2018 – 2021)

In or around 2018, Cedar's common stock price began to trade at a significant discount relative to its net asset value ("NAV") per share, as well as to its peers.  (Compl. ¶ 32.)  For example, in 2018, the shopping center public REIT sector traded at a 12% discount to NAV on average; Cedar's common stock traded as low as a 55% discount to NAV.  (Id. ¶ 33.) Recognizing Cedar's underperformance, in July 2019 the Board formed a special committee with the remit "to consider strategies to maximize stockholder value, including maintaining the Company's current strategy, selling non-core assets, pursuing larger asset sales in portfolio or Company-level transactions, or implementing a phased liquidation of the Company."  (Id. ¶ 34.)  The special committee "was authorized to consider and evaluate any proposals that might be received by the Company regarding a potential sale transaction, in whole or in part, and to participate in and direct the negotiation of the material terms and conditions of any such transaction."  (Id. ¶ 35.)  Although the special committee's process was interrupted by the Covid-19 pandemic, it restarted in earnest in early 2021.  (Id. ¶ 36.)

At the same time, Cedar faced mounting pressure from its shareholders to address its

lagging performance.  In February 2021, three of Cedar's large common shareholders—Barington

Companies Equity Partners, L.P. ("Barington"), Ewing Morris & Co. Investment Partners Ltd.

("Ewing"), and Camac Partners, LLC ("Camac")—piled further pressure on Cedar's Board by

announcing that they each planned to nominate their own directors for election to the Board.  (Id.

¶ 37.)   Ewing nominated Defendant Darcy Morris, and Camac nominated Defendants Richard

Ross and Sharon Stern.  (Id.)

### 3.    Cedar's Public Statements (March – August 2021)

Following the shareholders' announcement, on March 2, 2021, Cedar issued a press release

titled "Cedar Realty Trust Comments On Recent Public Announcements" (the "March Press

Release").  (Compl. ¶ 40.)  The March Press Release stated in relevant part as follows:

> Cedar Realty Trust's Board of Directors and management team are committed to
> acting in the best interests of shareholders as we work to deliver best-in-class
> performance for our investors and other stakeholders. . . .  We remain committed to
> corporate governance best practices and intend to further strengthen our Board with
> the near-term addition of one or more highly qualified candidates. . . .  [O]ur Board
> and management team are focused on navigating through this pandemic period and
> maximizing value for our shareholders.  We are always open to constructive input
> and assess all good ideas to create value for shareholders as the market and the
> Company's share price continue to recover from this unprecedented time.

(Id.)

On April 28, 2021, Cedar announced that it had agreed to appoint Morris, Ross, and Stern

to the Board.  (Id. ¶ 41.)  Cedar issued a press release titled "Cedar Realty Trust Announces

Appointment of Three New Independent Directors" (the "April Press Release"), which stated in

relevant part as follows:

> Cedar's Board of Directors is committed to adhering to the highest standards of
> corporate governance and acting in our shareholders' best interests.  To that end,
> after thoughtful deliberation, and in consultation with our shareholders, we are
> pleased to welcome Darcy [Morris], Richard [Ross], and Sharon [Stern] to our
> Board and look forward to working collaboratively with them to reach our goal of
> delivering superior shareholder value in the years ahead.  Our new directors bring

> substantial real estate and capital markets industry expertise and fresh perspectives, and further enhance our Board's alignment with shareholders.

(Id.)

Finally, on September 9, 2021, Cedar issued another press release, titled "Cedar Realty Trust Announces Dual-Track Review Of Strategic Alternatives To Maximize Shareholder Value" (the "September Press Release"), disclosing that the Board had "initiated a dual-track process" to carry out the strategic review previously delegated to the special committee. (Id. ¶ 42.) The September Press Release stated in relevant part as follows:

> [The] Board of Directors has initiated a dual-track process to review the Company's strategic alternatives in order to maximize shareholder value. As part of this process, Cedar is exploring, among other alternatives, a potential sale or merger involving the entire Company, and alternatively the potential sale of its core grocery-anchored shopping center portfolio and its mixed-use redevelopment projects.

(Id.) The September Press Release also included the following statement attributed to Schanzer:

> "We believe there is a profound disconnect between Cedar's share price and the underlying value of our real estate, as evidenced by recent transaction activity both within our portfolio and in our markets," stated Bruce Schanzer, President and CEO. "The Board is committed to maximizing value for all our shareholders and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that."

(Id.; O'Brien Decl. Ex. 10 at 7, ECF No. 23-10.)[1] Cedar also noted that "[n]o assurances can be given regarding the outcome or timing of the strategic review process," and that it "does not presently intend to make any further public comment regarding the process until it has been completed." (O'Brien Decl. Ex. 10 at 7.)

---

[1] In addition to the allegations in the complaint, courts may consider "written instruments attached [to the complaint], statements incorporated by reference [in the complaint], and public disclosure documents filed with the SEC." Gamm v. Sanderson Farms, Inc., 944 F.3d 455, 462 (2d Cir. 2019) (citation omitted). The full text of the September Press Release was included as an exhibit to Cedar's Form 8-K filed with the SEC on September 9, 2021, and attached as an exhibit to the Declaration of Sean R. O'Brien, ECF No. 23.

4

### 4.    The Board's Strategic Review (August 2021 – March 2022)

Plaintiff alleges that notwithstanding Defendants' statements in the March, April, and September Press Releases, which suggested that Cedar "was working to maximize value for all stockholders," (Compl. ¶ 39), Defendants "knew by at least August 2021 that any deal was likely to result in benefits only for common stockholders, who would exit at a premium, while preferred stockholders would not receive deal consideration and would be relegated to a small and less secure version of the Company surviving the transaction." (Id. ¶ 44.)  According to Plaintiff, on August 3, 2021, Cedar's Board "was actively negotiating the sale of a significant portion of Cedar's assets to multiple counterparties" and "instructed management to 'make outreach to potential counterparties' for the Company's remaining assets with the expectation that the deal(s) for the Company's primary assets would be successful." (Id. ¶ 45.)

Although the Board received "multiple offers" for Cedar "as a whole," it instead pursued a series of transactions that "would chop up the Company's properties, allow common stockholders to exit at a premium, and leave preferred stockholders behind as stockholders of Remainco," an entity that would be comprised of Cedar's remaining assets.  (Id. ¶¶ 46–47.)

On January 19, 2022, Cedar opened negotiations with Wheeler Real Estate Investment Trust, Inc. ("Wheeler") regarding a transaction involving Remainco. (Id. ¶ 47.)  Wheeler is a "tiny firm with historically inferior performance" and has "a history of abusing its preferred stockholders[.]" (Id. ¶ 62.)  The Board received a non-binding term sheet from Wheeler on January 27, 2022, which contemplated Wheeler's acquisition of Remainco in an all-cash transaction payable to Cedar's common shareholders. (Id. ¶ 49.)  Under the terms of the proposed transaction, Cedar's preferred shares would remain outstanding and, as a result, its preferred shareholders would receive no consideration in connection with the Remainco acquisition.  (Id. ¶ 50.)

5

Meanwhile, unaware of the pending negotiations between Cedar and Wheeler, Plaintiff began to purchase shares of Cedar's 6.50% Series C Cumulative Redeemable Preferred Stock ("Preferred Stock").  Between January 7, 2022 and February 28, 2022, Plaintiff purchased 85,770 shares.  (Id. ¶¶ 54–55.)

### 5.      Announcement of the Transactions (March 2022)

On March 2, 2022, Cedar announced a series of all-cash transactions through which it planned to sell itself and all its assets.  (Compl. ¶ 57–58.)  The transactions included three asset sales to third parties and, as relevant here, an agreement with Wheeler pursuant to which Cedar (as Remainco) would merge with WHLR Merger Sub Inc., a subsidiary of Wheeler, with Cedar as the surviving entity controlled by Wheeler.  (Id. ¶ 58.)  In a press release announcing the transactions, Cedar stated:  "We believe this combination of transactions represents the best possible outcome for our common shareholders and we are very pleased with the progress thus far of our dual-track review of strategic alternatives."  (Id. ¶ 59.)

After the transactions were announced, the price of Cedar's Preferred Stock plummeted from $22.85 per share on March 2 to $9.85 per share at the close of trading on March 3, on nearly 250 times the previous day's trading volume.  (Id. ¶ 68.)  As a result, Plaintiff alleges that it incurred unrealized losses of approximately $1.5 million.  (Id. ¶ 69.)

## B.      Procedural History

Plaintiff commenced this action on July 11, 2022.  Defendants then filed a pre-motion conference letter regarding their anticipated motion to dismiss, (ECF No. 11), to which Plaintiff responded, (ECF No. 15.)  The Court subsequently waived the pre-motion conference and so-ordered the parties' proposed briefing schedule.  (Electronic Order dated Oct. 25, 2022.)  Defendants filed the instant motion on February 17, 2023.  (ECF No. 21.)

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In general, a court must "'accept[] as true all factual claims in the complaint and draw[] all reasonable inferences in the plaintiff's favor.'"  Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co., 19 F.4th 145, 147 (2d Cir. 2021) (quoting Henry v. Cty. of Nassau, 6 F.4th 324, 328 (2d Cir. 2021)).  However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Twombly, 550 U.S. at 555.

### B.   Pleading Standards Applicable to Securities Fraud Claims

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007); see also In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 166 (2d Cir. 2021).

First, a complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "circumstances constituting fraud" be "state[d] with particularity[.]"  Under Rule 9(b), a plaintiff alleging fraud must:  "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  In re Synchrony, 988 F.3d at 167 (quoting Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 108 (2d Cir. 2012)).  "Allegations that are conclusory or unsupported by factual assertions are insufficient."  ATSI, 493 F.3d at 99.[2]

---

[2]    Like its securities fraud claims, Plaintiff's negligent misrepresentation claims "must be pled with particularity under Rule 9(b)" because "they are based on the same set of facts as the fraud claims."  Trahan

Second, the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), expands on Rule 9(b).  The PSLRA requires securities fraud complaints to "'specify each misleading statement; . . . set forth the facts on which a belief that a statement is misleading was formed; and . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  In re Synchrony, 988 F.3d at 167 (quoting Anschutz, 690 F.3d at 108).

## III.    DISCUSSION

Defendants argue that Plaintiff has failed to plausibly allege a claim for securities fraud under Section 10(b) and Rule 10b-5, and that without such a claim, Plaintiff's claims under Section 20(a) and for negligent misrepresentation should be dismissed as well.  (Defs.' Mem. at 2–3, ECF No. 22.)  Plaintiff opposes Defendants' motion on all fronts.  (Pl.'s Opp'n, ECF No. 24.)

The Court first examines Plaintiff's claims under Section 10(b) and Rule 10b-5, and, finding that Plaintiff has failed to state a claim for securities fraud under those provisions, briefly addresses Plaintiff's remaining claims.

## A.    Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Exchange Act provides that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device."  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b) by prohibiting, "in connection with the purchase or sale of any security," (a) "employ[ing] any device, scheme, or artifice to defraud," (b) "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to

---

v. Lazar, 457 F. Supp. 3d 323, 354 n.11 (S.D.N.Y. 2020) (citation omitted); see also DoubleLine Cap. LP v. Odebrecht Fin., Ltd., 323 F. Supp. 3d 393, 463 (S.D.N.Y. 2018) (dismissing negligent misrepresentation claim based on failure to satisfy Rule 9(b)'s pleading requirements).

make the statements made, in the light of the circumstances under which they were made, not misleading," and (c) "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5. Thus, "[t]o state a claim for relief under § 10(b) and Rule 10b-5, 'a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury.'" Altimeo, 19 F.4th at 149–50 (quoting Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204, 212 (2d Cir. 2020)).

Plaintiff's central allegation is that "[d]espite repeatedly representing to the investing public that the Company was seeking a value-maximizing transaction for all stockholders," in the March, April, and September Press Releases, "Defendants knew by at least August 2021 that any deal was likely to result in benefits only for common stockholders, who would exit at a premium, while preferred stockholders would not receive deal consideration and would be relegated to a smaller and less secure version of the Company surviving the transaction." (Compl. ¶ 44.) In other words, Defendants "led the market to believe that the Board was pursuing one type of transaction," which would benefit both common and preferred shareholders, "when it was, in fact, actively negotiating something very different," namely, a transaction that would benefit only common shareholders. (Pl.'s Opp'n at 8.) And as a result, Plaintiff argues, when Cedar announced the Wheeler transaction in March 2022, Cedar's Preferred Stock dropped, damaging persons who had bought Preferred Stock in reliance on Cedar's previous statements.

Defendants contend that Plaintiff's claims under Section 10(b) and Rule 10b-5 should be dismissed because (i) Cedar's statements in the March Press Release, April Press Release, and September Press Release are forward-looking and thus fall within the PSLRA's safe harbor; (ii)

Cedar's alleged misstatements and omissions are not material as a matter of law; (iii) Plaintiff fails to allege facts demonstrating that the alleged misstatements and omissions were false or misleading; (iv) Plaintiff fails to adequately plead scienter; (v) Plaintiff could not have reasonably relied on the alleged misstatements and omissions because the terms governing its Preferred Stock make clear that its rights are contractual; and (vi) Plaintiff fails to allege that a majority of Defendants made any misstatement or omission such that they may be subjected to liability. (Defs.' Mem. at 2–3.)

      1.      **The March and April Press Releases**

The Court begins its analysis with the March and April Press Releases. As discussed above, Plaintiff claims that the March and April Press Releases, together with the September Press Release, led the market to believe that Cedar was pursuing a transaction that would "benefit both common and preferred shareholders," when instead, it was negotiating "something very different[.]" (Pl.'s Opp'n at 8.) Plaintiff appears to challenge the following specific portions of the March and April Press Releases:

- "[The] Board . . . and management team are committed to acting in the best interests of shareholders as we work to deliver best-in-class performance for our investors and other stakeholders." (Compl. ¶ 40.)

- "[The] Board and management team are focused on navigating through this pandemic period and maximizing value for our shareholders." (Id.)

- "[The Board] [is] always open to constructive input and assess all good ideas to create value for shareholders[.]" (Id.)

- "[The] Board . . . is committed to adhering to the highest standards of corporate governance and acting in our shareholders' best interests." (Id. ¶ 41.)

- "[The Board] look[s] forward to working collaboratively with [Defendants Morris, Ross, and Stern] to reach our goal of delivering superior shareholder value in the years ahead." (Id.)

The shortcomings of Plaintiff's theory are immediately apparent: none of the alleged

10

misstatements in the March and April Press Releases is actionable.  To be actionable, a misstatement or omission must be material.  And as the Second Circuit has explained, "[t]o be material, 'a statement must, in the view of a reasonable investor, have 'significantly altered the total mix of information made available.'"  Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 100–01 (2d Cir. 2021) (quoting Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019)).  Here, however, the challenged statements are simply platitudes regarding the Board's commitment to acting in shareholders' interests—an obligation shared by the board of any public company.  They bear no relation to any future transaction, let alone the series of transactions about which Plaintiff complains.  Rather, they are precisely the type of generalized, corporate "buzzwords" that are "too general to induce reliance" by a reasonable investor.  Id. at 104 (citing ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 205–06 (2d Cir. 2009)).

Indeed, other courts within this Circuit have concluded that similar "[b]road statements about value creation and seizing opportunities are the type of corporate-speak that 'offer only generally optimistic opinions' and are non-actionable as puffery."  City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC, 587 F. Supp. 3d 56, 92 (S.D.N.Y. 2022) (quoting In re Synchrony, 988 F.3d at 170); see also id. (explaining that company's statement that transaction had "the potential to deliver significant long-term value to Shareholders" was non-actionable puffery); In re Synergy Pharms., Inc. Sec. Litig., No. 18-CV-873, 2021 WL 4480625, at *11 (E.D.N.Y. Sept. 30, 2021) (concluding that company's statement that loan would "ultimately maximize long-term shareholder value" was "too vague to be actionable"), aff'd in part, vacated in part on other grounds, remanded, No. 21-2724-CV, 2023 WL 5526675 (2d Cir. Aug. 28, 2023); In re Vale S.A. Sec. Litig., No. 15-CV-9539, 2017 WL 1102666, at *21 (S.D.N.Y.

Mar. 23, 2017) (holding that company's statements regarding its "values and commitment to health, safety, and the environment" were "aspirational generalizations" and therefore inactionable puffery); Hutchinson v. Perez, No. 12-CV-1073, 2012 WL 5451258, at *8 (S.D.N.Y. Nov. 8, 2012) (holding that defendants' statement that company would "continue to . . . create significant value of [sic] our shareholders" was inactionable puffery).

The Court's conclusion finds further support in the context in which the challenged statements appear. See In re Synchrony, 988 F.3d at 171 ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." (citation and internal quotation marks omitted)). The challenged statements in the March and April Press Releases are surrounded by general declarations of what the Board is "committed" to doing, what it is "focused on" and "work[ing] to deliver," and how it is "working collaboratively . . . to reach [its] goal[s][.]" (Compl. ¶¶ 40–41.) These are exactly "the types of qualifiers which render the [challenged] statements even more in the nature of puffery[.]" In re Vale, 2017 WL 1102666, at *22 (citing company's statements regarding "what [it] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are"); see also Plumber & Steamfitters Loc. 773, 11 F.4th at 103 (explaining that "[g]eneral declarations" of a company's goals are "inactionable puffery, especially when expressed in aspirational terms" (citation omitted)). Read in context, they are clearly "too general to induce reliance" by a reasonable investor. Id. at 104 (citation omitted). Accordingly, the challenged statements in the March and April Press Releases are not actionable.

### 2.     The September Press Release

Because Cedar's statements in the March and April Press Releases are not actionable, Plaintiff's claims under Section 10(b) and Rule 10b-5 depend on its allegations regarding the

September Press Release.

Plaintiff zeroes in on Schanzer's statement in the September Press Release that "[t]he Board is committed to maximizing value for all our shareholders and, accordingly, we believe that this dual-track strategic review process will enable us to achieve that." (Compl. ¶ 42; see also Pl.'s Opp'n at 8.) Plaintiff alleges that this statement was materially misleading because despite Cedar's stated "commit[ment] to maximizing value for all [its] shareholders," Defendants "knew by at least August 2021 that any deal was likely to result in benefits only for common stockholders, who would exit at a premium, while preferred stockholders would not receive deal consideration and would be relegated to a smaller and less secure version of the Company surviving the transaction." (Compl. ¶ 44.) However, for several reasons, these allegations—whether viewed as "alleging a material omission, a misleading statement, or half-truth," In re DraftKings Inc. Sec. Litig., No. 21-CV-5739, 2023 WL 145591, at *32 (S.D.N.Y. Jan. 10, 2023)—fail to state a claim under Section 10(b) and Rule 10b-5.

    a.   <u>Materiality</u>

As an initial matter, the precise statement on which Plaintiff relies—that "[t]he Board is committed to maximizing value for all our shareholders"—is, for the same reasons as the March and April Press Releases, "too general to induce reliance" by a reasonable investor. <u>Plumber & Steamfitters Loc. 773</u>, 11 F.4th at 104 (citation omitted). Even if it represents a "statement[] about a specific state of affairs," as Plaintiff argues, (Pl.'s Opp'n at 12), it still must be read in context. <u>See</u> <u>In re Synchrony</u>, 988 F.3d at 171. The September Press Release focuses on what Cedar intends to "explor[e]" through its strategic review, and how it "believe[s]" that this review will enable the Company to "achieve" its goals. Additionally, the September Press Release cautions investors that "[n]o assurances can be given regarding the outcome or timing of the strategic review

process." (O'Brien Decl. Ex. 10 at 7.)  When placed in proper context amid myriad other "aspirational terms" and disclaimers, the challenged statement is no more than a "general declaration" of Cedar's goals.  See Plumber & Steamfitters Loc. 773, 11 F.4th at 103; see also In re Vale, 2017 WL 1102666, at *22.  Therefore, it is not actionable.

   b. <u>Falsity</u>

  In any event, the complaint does not adequately allege that the challenged statement in the September Press Release was false or misleading—or that subsequent events rendered it false or misleading, such that Cedar assumed a duty to disclose or update.

  First, Plaintiff has not plausibly alleged that the challenged statement was false or misleading at the time it was made.  See In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false <u>at the time it was made</u>." (emphasis in original)), aff'd, 604 F. App'x 62 (2d Cir. 2015).  According to the complaint, by August 2021, Defendants "knew . . . that any deal was likely to result in benefits only for common stockholders[.]"  (Compl. ¶ 44.)  Specifically, "[o]n August 3, 2021, the Board was actively negotiating the sale of a significant portion of Cedar's assets to multiple counterparties and instructed management to 'make outreach to potential counterparties' for the Company's remaining assets with the expectation that the deal(s) for the Company's primary assets would be successful." (Id. ¶ 45.) Plaintiff contends that by this time, "[t]he die was cast, and the Company's assets inevitably would be stripped for the benefit of common shareholders," (Pl.'s Opp'n at 11), and therefore, Schanzer's later statement in September 2021 that the Board remained "committed to maximizing value for all [Cedar's] shareholders" was false or misleading.

  However, Plaintiff has not alleged any facts demonstrating that Schanzer's statement was

14

false or misleading at the time it was made.  As Defendants point out, Plaintiff has not plausibly alleged that "Defendants had settled upon a particular form of transaction either as of August 2021 . . . , or as of the date of the September 2021 press release announcing the 'dual-track' process to review strategic alternatives."  (Defs.' Reply at 5, ECF No. 25.)  Indeed, on closer scrutiny, Plaintiff's assertions that by September 2021, "the die was cast" and Defendants were "seeking only to achieve" a positive outcome for common shareholders, (Pl.'s Opp'n at 11, 12), are unsupported by any well-pleaded factual allegations.[3]

Plaintiff insists that the structure of Cedar's transaction with Wheeler, which was not even contemplated until January 2022, (Compl. ¶¶ 48–49), somehow renders Schanzer's statement in September 2021 false or misleading.  (Pl.'s Opp'n at 2.)  But even if the Wheeler transaction ultimately did not treat all shareholders alike, that subsequent fact does not show that Schanzer's statement—that Cedar would seek to "maximiz[e] value for all our shareholders"—was false or misleading when it was made.  At bottom, Plaintiff's allegations amount to nothing more than "fraud by hindsight."  Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 812 (2d Cir. 1996) (affirming dismissal of securities fraud claims where plaintiffs failed to allege facts "demonstrating that during the class period [the defendant] was doing anything but pursuing [its expressed] strategy," or that defendant "made any statements or predictions foreclosing the possibility of adopting alternative marketing strategies"); In re Kirkland Lake Gold Ltd. Sec. Litig., No. 20-CV-4953, 2021 WL 4482151, at *4–5 (S.D.N.Y. Sept. 30, 2021) (rejecting plaintiff's allegations regarding acquisition as "fraud by hindsight" because challenged statements "were not

---

[3]    Plaintiff's additional allegation that Defendants "knew" by August 2021 that "any deal was likely to result in benefits only for common stockholders," (Compl. ¶ 44), is entirely conclusory and therefore fails to satisfy Rule 9(b).  See ATSI, 493 F.3d at 99.

false when made, made no explicit promises, and did not foreclose a future acquisition"). Here, as in San Leandro and Kirkland, Plaintiff does not plausibly allege that the challenged statement was false or misleading when it was made. Likewise, Defendants made "[n]o assurances . . . regarding the outcome or timing of the strategic review process," and the Board expressly noted that it was considering various "alternatives," which it disclosed. (O'Brien Decl. Ex. 10 at 7.)

Second, for similar reasons, Plaintiff has not plausibly alleged an actionable omission. It is well-settled that "'[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5.'" In re Synchrony, 988 F.3d at 167 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)). Thus, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts," such was when "a statement is made that would be inaccurate, incomplete, or misleading without further context." Id. (internal quotation marks omitted). At the same time, "[i]t is equally well established that a company has no such duty to disclose changes to its business plans—unless the company 'had "hyped" a specific plan, thereby inducing investors to believe that alternative plans were excluded.'" Friedman v. Endo Int'l PLC, No. 16-CV-3912, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) (quoting San Leandro, 75 F.3d at 810 (alterations omitted)).

Plaintiff asserts that Cedar's "misstatement in September 2021 that the Board was pursuing a transaction to maximize value for 'all our shareholders' was materially misleading in view of the undisclosed fact that, by at least August 2021, the Board was orchestrating a transaction that would inequitably transfer much of the Company's value solely to common stockholders at the expense of the preferred stockholders." (Pl.'s Opp'n at 9.) Plaintiff also maintains that by "comment[ing] on the nature of the transaction the Board was orchestrating," Defendants assumed a duty to disclose "that the Board was actually negotiating a transaction that would . . . destroy significant

16

value for preferred shareholders." (Id. at 10.)  Plaintiff cites several cases in support of this proposition, but none supports its claims here.

Plaintiff relies primarily on In re Time Warner Inc. Sec. Litig., 9 F.3d 259 (2d Cir. 1993), but Time Warner is distinguishable.  The plaintiffs in Time Warner claimed that the company's "highly publicized campaign to find international 'strategic partners' who would infuse billions of dollars of capital into the company," was false and misleading because the company failed to disclose that it was actively and seriously considering an alternative method of raising capital.  9 F.3d at 267–68.  The Second Circuit held that the company's decision to "publicly hype[] strategic alliances" may have given rise to "a duty to disclose facts that would place the statements concerning strategic alliances in a materially different light," i.e., that it was simultaneously considering strategies that it had implicitly ruled out.  Id. at 268.  Similarly, the portion of Kirkland on which Plaintiff relies involved allegations that the company was "actively considering" a specific acquisition, despite the CEO "explicitly downplay[ing]" the possibility of acquisitions generally and the suitability of the target company specifically.  2021 WL 4482151, at *3.  Because the CEO "mentioned acquisitions while simultaneously minimizing it as an approach for [the company] to grow," the plaintiff's allegations were sufficient to survive a motion to dismiss.  Id. And in Hi-Crush Partners L.P. Sec. Litig., No. 12-CV-8557, 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013), the court held that the plaintiff had adequately alleged a duty to disclose where the company had "publicly hyped the importance of its relationship" with "one of its largest customers," even after the customer had repudiated its contracts with the company.  Id. at *13–14.

By contrast, the Court agrees with Defendants that the well-pleaded allegations in the complaint suggest that "nothing material was hidden from investors" in Cedar's press releases. (Defs.' Reply at 8.)  In fact, Plaintiff's own allegations are entirely consistent with Cedar's

17

statements in the September Press Release regarding the Board's negotiations in early August 2021. Just as Plaintiff alleges that the Board "was actively negotiating the sale of a significant portion of Cedar's assets" and "instructed management to 'make outreach to potential counterparties'" regarding other asset sales, the September Press Release communicated that the Board had "initiated a dual-track process to review the Company's strategic alternatives," and that the Company was "exploring, among other alternatives, a potential sale or merger involving the entire Company, and alternatively the potential sale of [specific assets]." (Compl. ¶ 42.) Unlike the cases on which Plaintiff relies, Cedar's Board even disclosed the specific assets under consideration as part of any potential asset sale, which were ultimately sold to third parties as part of the Wheeler transaction. (See O'Brien Decl. Ex. 10 at 7 (listing Cedar's real estate advisors "with respect to a potential sale of the grocery-anchored shopping center portfolio" and "the mixed-use redevelopment projects," respectively).) And the Board expressly disclaimed any certainty regarding "the outcome or timing of the strategic review process." (See id.) Therefore, Plaintiff has not plausibly alleged that Cedar "'stated its intention to adhere exclusively to' a particular strategy and then changed its strategy without informing investors," such that it had a duty to disclose. Friedman, 2018 WL 446189, at *6 (quoting Pehlivanian v. China Gerui Advanced Materials Grp., Ltd., 153 F. Supp. 3d 628, 651 (S.D.N.Y. 2015)).[4]

---

[4]      To the extent Plaintiff argues that subsequent events obligated Defendants to update their statements in the March, April, and September Press Releases, that argument fails. As discussed above, the challenged statements in the press releases were not material. Defendants therefore had no duty to update them. See In re Int'l Bus. Machines Corp. Sec. Litig., 163 F.3d 102, 110 (2d Cir. 1998) (explaining that "there is no duty to update" if "the original statements are not material" (citations omitted)). At most, Defendants' statements reflected expressions of optimism regarding the strategic review to be undertaken by the Board. But, "[a] corporation's expressions of optimism about negotiations, without definite positive projections, do not create a duty to disclose all aspects of the negotiation to investors." In re Synchrony, 988 F.3d at 167; see also id. ("In other words, there is no duty to update vague statements of optimism or expressions of opinion." (internal quotation marks omitted)).

18

Because the Court concludes that the complaint does not plausibly allege a false or misleading statement or omission of material fact, Plaintiff's claims under Section 10(b) and Rule 10b-5 must be dismissed.[5]

## B.   Section 20(a) Claims

To state a claim for control person liability under Section 20(a) of the Exchange Act, "a plaintiff is required to establish, among other things, 'a primary violation' of the securities laws." Steamfitters' Indus. Pension Fund v. Endo Int'l PLC, 771 F. App'x 494, 498 (2d Cir. 2019) (citing Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014)). Because the complaint fails to state a primary violation under Section 10(b) and Rule 10b-5, it necessarily fails to state a claim under Section 20(a).  See Plumber & Steamfitters Loc. 773, 11 F.4th at 98 n.2 ("The failure to sufficiently plead actionable misstatements or omissions is fatal to the [plaintiffs'] § 10(b) claim.  Because their § 20(a) claim depends on a viable § 10(b) claim, the § 20(a) claim fails as well.").   Accordingly, Plaintiff's Section 20(a) claims are dismissed.

## C.   Negligent Misrepresentation Claims

To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that "'(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'"   Anschutz, 690 F.3d at 114 (quoting Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)).

---

[5]      As a result, the Court need not reach Defendants' additional arguments in support of dismissal of Plaintiff's claims under Section 10(b) and Rule 10b-5.  (See Defs.' Mem. at 14–15, 18–22.)

Here, because the complaint fails to plausibly allege that Defendants made a false representation of a material fact that they knew or should have known was incorrect, Plaintiff's negligent misrepresentation claim must be dismissed.  See Walsh v. Rigas, No. 17-CV-4089, 2019 WL 294798, at *13 (S.D.N.Y. Jan. 23, 2019) (explaining that "the identical analysis applies" to securities fraud and negligent misrepresentation claims and dismissing negligent misrepresentation claims "for same reasons that plaintiff's securities claims failed").

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED and the complaint is DISMISSED with prejudice.  The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

**SO ORDERED.**

Dated:    September 25, 2023
            Central Islip, New York

                                                              /s/ JMA
                                              _____
                                              JOAN M. AZRACK
                                              UNITED STATES DISTRICT JUDGE

20